## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Matthew J. Cavendish DDS, PLLC,

       Plaintiff,

    v.

Zelis Healthcare LLC; Zelis Claims
Integrity, LLC; UnitedHealth Group, Inc;
Elevance Health Inc.; Aetna, Inc.; and
The Cigna Group,

       Defendants.

**Case No.**

**<u>JURY DEMAND</u>**

## <u>COMPLAINT—CLASS ACTION</u>

Plaintiff Matthew J. Cavendish DDS, PLLC brings this case against defendants Zelis Healthcare, LLC and Zelis Claims Integrity, LLC (collectively, "Zelis"), and defendants UnitedHealth Group, Inc., Elevance Health Inc., Aetna, Inc., and The Cigna Group, and in support thereof states:

### INTRODUCTION

1.    This case involves a price-fixing conspiracy between Zelis and much of the commercial healthcare insurance industry, including the defendant Insurers to unlawfully suppress out-of-network ("OON") payments to healthcare providers ("Providers"), including both medical and dental providers (the "Zelis Conspiracy"). Zelis and other insurer co-conspirators conspired to reduce payments OON services through an industry practice known as "repricing." Zelis agrees to provide its "repricing" services to private, commercial health insurers, managed care organizations, third-party administrators,

preferred provider organization networks ("PPOs"), self-funded plans, and self-insured entities (collectively, "Insurers")—designed to systematically enable these Insurers to underpay on claims submitted for OON services. Zelis, the Insurers, and others share sensitive information and set reimbursement rates to enable Insurers to suppress the reimbursements to Providers for claims submitted for OON services.

2.    Most people in the United States have some form of healthcare insurance, typically a PPO or other healthcare plan that offers a network of providers that pays for medical services at different rates depending on whether they are in-network or OON. While patients typically select an in-network provider, the right to seek treatment from an OON Provider is important to allow patients to choose their preferred doctor, facilitate access to healthcare for people who live in areas where in-network options are limited, and offer important healthcare specialties that are not widely available.

3.    Because Zelis sets the reimbursement rates for OON services so low, often below operating costs, Providers must lose money or decline to provide care. Defendants' anticompetitive conduct has forced many practices to stop offering services, merge with larger practices, or even consider closing down, thereby limiting access to health care.

4.    At a basic level, a PPO is simply a large network of approved providers who have agreed to offer services within their network at discounted rates. When an insured patient receives OON care, per the terms of the patient's particular policy, the Insurer is obligated to pay for that care. Because the OON Provider has not agreed to treat OON patients at discounted rates, Insurers conspired with Zelis to force OON Providers to accept discounted rates without receiving any of the benefits of being in a PPO network.

5.      By paying legitimate claims at a small fraction of the cost, Zelis, the Insurers, and their co-conspirators inflict financial harm on those providing OON care and competitive harm to their practices. Since the outset of the alleged conspiracy, U.S. health insurance costs have risen and continue to rise (while OON payment amounts have plummeted).

6.      While reducing doctors' bills might sound like it would reduce the cost of healthcare, that is neither the intent nor the effect of this conspiracy. Zelis' repricing has not reduced the cost of healthcare—only increased the profits of Insurers and Zelis. Instead of reducing costs, Zelis' anticompetitive conduct limits access to quality healthcare generally and patients' right to choose their own doctor specifically while artificially inflating the profits of Zelis and the Insurers with whom it conspires.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

7.      This Court has subject matter jurisdiction under 15 U.S.C. § 26 and 28 U.S.C. §§ 1331, 1333(d), and 1337(a).

8.      Venue is proper in Minnesota under 15 U.S.C. §§ 15, 22, and 26; and 28 U.S.C. § 1391(b), (c), and (d), as one or more Defendants transacted business in Minnesota, is licensed to do business or is doing business in Minnesota, and a substantial portion of the affected interstate commerce was carried out in Minnesota.

9.      This Court has personal jurisdiction over all Defendants under 15. U.S.C. § 22 and 28 U.S.C. § 1391 because each Defendant: (a) transacted business throughout the U.S., including in Minnesota; (b) paid healthcare providers throughout the U.S., including from Minnesota; (c) had substantial contacts throughout the U.S., including Minnesota;

and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business in Minnesota.

10.    Defendants' anticompetitive conduct described herein was within the flow of, was intended to, and has direct, substantial, and reasonably foreseeable effects on interstate commerce because Zelis and its co-conspirators sell and market PPO Networks, PPO Plans, insurance products and services, repricing products and services, and other related products and services to persons who reside in states other than those where Zelis resides through offices and employees in various states, D.C., and U.S. territories.

## PARTIES

### I.    Plaintiff

11.    Plaintiff Matthew J. Cavendish DDS, PLLC is an Arizona corporation with its principal place of business in Phoenix, Arizona.  Throughout the Class Period, Plaintiff provided OON healthcare services and received repriced payments in amounts established by Zelis below competitive rates because of the violations alleged herein.

### II.    Defendants

12.    Defendant Zelis Healthcare, LLC is a Delaware limited liability company with its principal place of business in Boston, Massachusetts. Zelis Healthcare is the face of "Zelis," which is actually a myriad of corporate entities that begin with the name "Zelis." Zelis Healthcare owns and maintains a variety of websites concerning "Zelis" that do not distinguish between its various corporate entities. Zelis Healthcare disregards corporate formalities by disguising these corporate distinctions from public view and uses each of its

4

various Zelis entities to carry out the conspiracy. As a result, each of the Zelis entities are joint venturers in the Zelis conspiracy and are liable for the acts of each other Zelis entity.

13.    Defendant Zelis Claims Integrity, LLC, is a Delaware limited liability company with its principal place of business in Boston, Massachusetts. Zelis Claims Integrity interacts directly with healthcare providers, including Plaintiff, to convey the "repriced" reimbursement rates determined by Zelis and its co-conspirators.

14.    Defendant UnitedHealth Group, Inc. ("UnitedHealth") is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota. UnitedHealth is the largest healthcare insurance company in the United States with a network of providers in all 50 states, operating through various health insurance plans.

15.    Defendant Elevance Health, Inc. ("Elevance") f/k/a Anthem, Inc., is an Indiana corporation with its principal place of business in Indianapolis, Indiana. Elevance is one of the largest healthcare insurance companies in the United States with a nationwide network of providers, operating through various Blue Cross and Blue Shield health insurance plans.

16.    Defendant Aetna, Inc. ("Aetna") is a Delaware corporation with its principal place of business in Hartford, Connecticut. Aetna is one of the largest healthcare insurance companies in the United States with a network of providers in all 50 states, operating through various health insurance plans.

17.    Defendant The Cigna Group ("Cigna") is a Delaware corporation with its principal place of business in Bloomfield, Connecticut. Cigna is one of the largest

healthcare insurance companies in the United States with a network of providers across the country, operating through various health insurance plans.

18.     UnitedHealth, Elevance, Aetna, and Cigna (collectively, the "Insurer Defendants") have each entered into agreements with Zelis through which they share sensitive claims information with Zelis and authorize Zelis to reprice OON claims.

**III.    Co-Conspirators and Agents.**

19.     Zelis maintains information-sharing agreements with the Insurer Defendants, other Insurers and other repricing entities, each of which serve as co-conspirators in this price-fixing conspiracy.

20.     Zelis is jointly and severally liable for the acts of their co-conspirators, whether those co-conspirators are named as defendants or not.

21.     Zelis' anticompetitive conduct was authorized, ordered, permitted, or performed by their respective officers, agents, employees, or representatives, while actively engaged in the control, direction, operations, or management of Defendants' businesses and affairs. Defendants are also liable for conduct in furtherance of the conspiracy alleged herein by companies acquired or transformed into Defendants through mergers and/or acquisitions.

22.     Each Defendant, through its respective parents, subsidiaries, affiliates, and/or agents, operated as a single unified entity.

23.     Each and every agent associated with a particular Defendant acted and/or failed to act in furtherance of the conspiracy under the authority and apparent authority of its respective principals, including of that particular Defendant.

24.     Each Defendant and co-conspirator acted as the principal, agent, or joint-venturer of the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged in this Complaint.

## FACTUAL ALLEGATIONS

25.     Zelis' price-fixing conspiracy involves agreements with Insurers and other co-conspirators to share claims, pricing, and contractual information to fix and/or suppress the payments to Providers for OON services, thereby reducing patients' options for medical care.

26.     A patient's decision to use OON services is often based on the *unavailability* of the procedure within that patient's PPO. Patients are usually better off financially when using in-network healthcare services, meaning a patient deciding to "go out-of-network" is often basing this decision on her or his PPO Network *not providing* network-based access to a particular provider or a particular healthcare service at issue.

27.     A nationwide survey of 713 commercial plan enrollees, for "General Health care" patients (as opposed to "Mental Health Care" patients) reported that 24% of patients cited as a reason for seeking OON care the fact that "[p]roviders were not taking new patients."[1] In the same survey, 22% of patients cited "[i]naccurate in-network provider

---

[1] *See Top Reasons Patients Go Out of Network*, Med Central (Mar. 31, 2024), http://ww.medcentral.com/biz-policy/top-reasons-patients-go-out-of-network (last visited Aug. 23, 2024).

directories."[2] General health care patients simply could not access services or providers through their PPO—*even when they wanted to do so*.[3]

28.     As listed by the Patient Advocate Foundation ("PAF"), there are various circumstances in which a patient might seek OON services, including for emergencies, distance issues, specialist care, and out-of-town care.[4] PAF noted specifically that "[i]f you have a rare condition, specialists can be limited, so out-of-network care may be your only option. Or if your treating specialist leaves your insurance network, you may choose to continue that care by going out-of-network."[5]

29.     Zelis, the Insurers, and other co-conspirators secretly agreed to suppress OON payments by limiting them to specific amounts, ranges, percentages, or below certain thresholds, as determined by concealed and "proprietary" analytical tools, databases, and methodologies owned and operated by Zelis, as detailed herein.

30.     Zelis repriced OON claims by feeding its analytical tools not only with its own pricing and claims data, but also confidential, ostensibly proprietary, and

---

[2] *Id.*

[3] *Id.*

[4] *The Ins and Outs of Seeking Our-of-Network Care*, Patient Advocate Foundation, https://www.patientadvocate.org/wp-content/uploads/EP-Seeking-Out-of-Network-Care.pdf#:~:text=Going%20out%2Dof%2Dnetwork%20means%20you're%20visiting%2 0a%20provider,coverage%20at%20all%20from%20your%20insurance%20provider (last visited Mar. 19, 2025).

[5] *Id.*

competitively-sensitive claims, pricing, and contractual data from directly-competing Insurers.

31.    Defendants and their co-conspirators have applied collusively-determined percentages, payment amounts, or price ceilings, a *per se* price-fixing agreement in violation of Section 1 of the Sherman Act has occurred.

32.    The conspiracy involves several prongs:

- First, Zelis obtains confidential, proprietary, and competitively-sensitive claims and pricing data from Insurers and then, with the Insurers' agreement, uses that information to reprice and lower insurance reimbursements. Zelis provides maximum amounts or ceilings to supplant any calculations of a market rate.

- Second, the Insurers incentivize Zelis to maximize reductions in bills by paying it on a commission basis based on the difference between the amount billed and the amount paid.

- Third, Zelis has similar data-sharing agreements with other horizontal rival repricing companies.

- Fourth, Zelis itself acts as an Insurer and thus competes with Insurers with which it agrees to lower insurance reimbursements.

33.    Zelis acts as both a co-conspirator to the Insurers and as their agent. As the Insurers delegate their independent pricing responsibility to Zelis for OON healthcare service claims, Zelis acts within the scope of its authority as the Insurers' agent when it reprices OON claims. Starting in 2016, Insurers formally agreed to provide commercially sensitive data to Zelis, knowing that Zelis was collecting similar data from competitors and using it to reprice reimbursements paid by Zelis and co-conspirator Insurers.

34.    Absent a conspiracy, Zelis and other Insurers would compete to persuade healthcare providers to join their PPO so that, in turn, their insurance products would

interest employers and other consumers. Instead, Zelis and Insurers obtain substantial repricing discounts without providing any benefits to the Provider of being in-network.

## I.    History of Conspiratorial Payment Suppression in the Healthcare Industry

### A.    The Ingenix Conspiracy: 1997–2009

35.    From approximately 1997 to 2009, several healthcare insurers conspired to fix payment rates through a UnitedHealthcare Group subsidiary known as Ingenix, Inc.

36.    Before 1997, insurers paid OON providers through usual, customary, and reasonable ("UCR") rates as established by independent databases: Prevailing Healthcare Charges System and Medical Data Resource developed in 1973 and 1987, respectively.

37.    Realizing that health insurers stood to profit from underpaying OON providers, Ingenix, Inc. purchased both of these databases, consolidating them around 2001 into a new database called "Ingenix."

38.    Vertically integrated with UnitedHealthcare, Ingenix was inherently conflicted. Its database improperly included already heavily discounted in-network payment rates and systematically removed otherwise valid, but higher, medical payment amounts. A New York Attorney General ("NYAG") investigation revealed that insurers would "pre-scrub" data, eliminating certain comparatively higher payments before submitting the data to Ingenix.[6] As a result, Ingenix was populated with biased, improperly pooled, and inaccurate data. Carolyn Gee, Ingenix Manager of Research and Development,

---

[6] *The Consumer Reimbursement System is Code Blue*, New York Attorney General, (Jan.                              13,                              2009), https://www.leg.state.nv.us/App/InterimCommittee/REL/Document/19460.

testified that "Ingenix has never tested its results to determine if its statistical conclusions bear any relationship to the actual high, low median or 80th percentile . . . rates charged by health care providers in any given area." *Michael Davekos, P.C. v. Liberty Mutual*, 2008 Mass. App. Div. 32, 36, 2008 WL 241613 (Mass. App., Jan. 24, 2008). Ingenix eliminated independent, UCR-based payment amounts.

39.    The    NYAG    investigation    concluded    that    insurers—including UnitedHealthcare, Aetna, and others—conspired to use the Ingenix database to understate UCR payment rates for OON services by 10 to 28 percent.[7]

40.    In 2000, the American Medical Association, state-based medical associations, and physicians and patients filed lawsuits against insurers that used Ingenix for violating antitrust laws. UnitedHealthcare settled this litigation in 2009, agreeing to pay $350 million in a class action settlement. *See Am. Med. Ass'n v. United Healthcare Corp.*, 2009 WL 1437819, at *2 (S.D.N.Y. May 19, 2009).

**B.    The FAIR Health Database Period: 2010–2015**

41.    In 2009, 12 of those insurers settled with the NYAG and agreed to create an unbiased, independent database designed to replace Ingenix.[8] This new database became

---

[7] *Id.* at 2.

[8] Martha Graybow, *UnitedHealth settles New York Reimbursement probe*, Reuters, (Jan. 13, 2009) https://www.reuters.com/article/markets/stocks/unitedhealth-settles-new-york-reimbursement-probe-idUSTRE50C5V8/#:~:text=UnitedHealth%20was%20the%20only%20insurer,the%20New%20York%20Stock%20Exchange (last visited Mar. 19, 2025).

known as FAIR Health and was released by mid-2010. Insurers agreed to use FAIR Health exclusively for five years; thus, reliance on FAIR Health was short-lived.

42.    FAIR Health is an unbiased, non-profit entity, designed to establish UCR payment rates. These UCR rates were based, in part, on the performance of a particular medical service in a particular geographic market. In contrast to tying commissions to the amount "saved" by insurers, subscribers paid FAIR Health a flat annual fee to access this data.

43.    Incorporating rules designed to prevent bias and pollution, FAIR Health caused payment levels to course-correct, resulting in an approximate 26% increase in OON payments. While half of that increase was apparently cost-of-living increases, the other half represented the trueing of the data determining OON payments.

**C.    Zelis—a New Conspirator in For-Profit Repricing Systems: 2016 to Present**

44.    Participating insurers disliked FAIR Health's impact on OON payment levels.

45.    As the exclusive-use period expired, Insurers began replacing their reliance on UCR payment amounts and FAIR Health. By mid-June 2016, hundreds of insurers had replaced or added to FAIR Health with Premier Health Exchange, Inc. ("PHX"), now Zelis. On June 13, 2016, around the time when FAIR Health's exclusive use term expired, Zelis issued a press release explaining that it "provides a comprehensive array of network

management, claims integrity, payment remittance solutions and analytical services for medical, dental and workers' compensation claims to over 500 payor clients."[9]

46.    Insurers (and Zelis) have earned vast profits by returning to private, for-profit, proprietary repricing systems. Zelis boasts that its "platform serves more than 750 payers, including the top 5 national health plans, BCBS insurers, regional health plans, TPAs and self-insured employers."[10] Zelis "[p]artner[s] with over 770 insurance companies."[11]

### D.    Competitive OON Payment Baseline Periods: Before 1997 and 2010-2015

47.    Certain competition-based OON pricing occurred during two time periods: (1) before Ingenix's arrival in 1997, and (2) during operation of FAIR Health from 2010-2015.

48.    In contrast, from around 2016 on, as Insurers migrated from FAIR Health to Zelis, coordinated payment suppression for OON services became, once again, the norm.

### II.    Zelis Provides "Repricing" Services Contrary to the Interests of Providers

---

[9] *Newly Named Zelis Healthcare Introduced to Healthcare Community, Offers Integrated Suite of Claims Cost Containment and Payments Technology*, Patheon Capital (June 13, 2016), https://www.parthenoncapital.com/news/newly-named-zelis-healthcare-introduced-to-healthcare-community-offers-integrated-suite-of-claims-cost-containment-and-payments-technology/ (last visited Mar. 19, 2025).

[10] *Zelis Named to Inc. 5000 List of Fastest-Growing Companies*, Zelis (Aug. 13, 2024), https://www.zelis.com/news/zelis-named-to-inc-5000-list-of-fastest-growing-companies/ (last visited Mar. 21, 2025).

[11] *Leading the way forward in modernizing your business*, Zelis, https://www.zelis.com/built-for-payers/health-plans/ (last visited Mar. 19, 2025).

A.    **Zelis' Repricing Incentives**

49.    Zelis' repricing services reduce payments to OON Providers. Zelis "[l]everage[s] [an] AI-powered dynamic optimization engine to find quality recommended savings on every claim [and] [o]ur AI-powered optimization engine uses dynamic routing to examine every available saving channel to drive valued savings."[12]

50.    Repricing does not involve any negotiation between Zelis and the Provider who receives Zelis' repriced OON payment amount. Although neutral sounding, "repricing" of healthcare services goes only one direction: down.

51.    The following timeline reflects the expansion of Zelis' empire:

- 2003: While still named "Stratose®," Zelis' predecessor acquired a company called "PHX," thus "integrating claims cost management strategies" into its "innovative wrap network solution" offering.

- 2012: Stratose® acquired "Pay-Plus Solutions," thus "bringing payment innovations to our growing platform."

- 2015: Stratose® re-branded itself as Zelis, "promising a single-source solution to lower costs."

- 2017: Zelis acquired a series of companies, including Truven, Ethicare, Strenuus and the Maverest Dental Network.

- 2018: Zelis acquired NetMinder.

- 2019–2021: Zelis acquired RedCard in 2019 and Sapphire Digital in 2021.

- 2022: Zelis acquired two entities. First, it "[e]xpanded Medicare capabilities, reference-based pricing, and payment integrity with

---

[12]    *Gain control of out-of-network costs with Zelis,* Zelis, https://www.zelis.com/solutions/out-of-network-solutions/ (last visited Mar. 19, 2025).

acquisition of PayerCompass." Second, it "[e]xpand[ed] payments network and capabilities with acquisition of PaySpan." [13]

52.    "The acquisition of Payspan gives Zelis capabilities around managing insurance premium payouts, says Yusuf Qasim, president of payments optimization."[14]

53.    Further, "Zelis generates around $450 million in EBITDA . . . ."[15] Data compilation by "Grojo," which cites articles dating from late April 2022 in its "Zelis News" section, estimates Zelis' annual revenue at $429.5 million[16] More recent data indicates that "[a]s of January 2025, Zelis' annual revenue reached $750M."[17]

54.    As of fall 2024, Zelis was valued "at about $17 billion" with significant private equity owners including "Bain Capital and Parthenon Capital."[18] According to

---

[13] *A Legacy of Impact Milestones*, Zelis, https://www.zelis.com/company/ (last visited Mar. 19, 2025).

[14] *Zelis warms to large-scale M&A*, Axios (Nov. 15, 2022), https://www.axios.com/pro/health-tech-deals/2022/11/15/zelis-warms-to-large-scale-ma (last visited Mar. 19, 2025).

[15] *Id.*

[16] *Id.*

[17] *Zelis Revenue*, leadiQ, https://leadiq.com/c/zelis/5a1d8aad240000240064a2b3 (last visited Mar. 17, 2025).

[18] Michelle F. Davis et al., *Mubadala Nears Deal to Buy Stake in Health Tech Firm Zelis*, BNN Bloomberg (Oct. 21, 2024), https://www.bnnbloomberg.ca/business/company-news/2024/10/21/mubadala-near-a-deal-to-buy-stake-in-health-tech-firm-zelis/ (last visited Mar. 19, 2025).

Zelis' CEO, Amanda Eisel, "[p]rior to Zelis, [she] was an Operating Partner at Bain Capital focused on technology and healthcare IT companies."[19]

55. As explained in a March 6, 2020, order: "'Under Cigna's Cost Savings Program, Zelis and CHP are incentivized to drastically reduce claims amounts payable to providers because the commission they receive is calculated as a percentage of savings." *IJKG Opco LLC v. Gen'l Trad. Co*., No. 17-6131 (KM), 2020 WL 1074905, at *5 (D.N.J. Mar. 6, 2020).

56. Zelis' repricing incentive scheme is designed such that the less money that is paid to OON Providers from an originally submitted claim, the more money Zelis receives.

**B. Zelis Directly Competes with its Insurer Co-Conspirators**

57. As a PPO network, Zelis directly competes with other Insurers.

58. Zelis' status as an Insurer is legally significant because it engages in illegal sharing of competitively-sensitive claims, pricing, and contractual information with horizontal competitors, including other Insurers, *at the moment* when such information is shared, and at *every subsequent moment* such information is shared thereafter.

59. Zelis not only serves as a "payer," but also as a healthcare network architect. Zelis boasts that it can "[m]odel and build primary, secondary, wrap and specialty networks."[20]

---

[19] Amenda Eisel, *Amenda Eisel, CEO: Why I joined Zelis*, Zelis (Dec. 1, 2021), https://www.zelis.com/blog/amanda-eisel-why-i-joined-zelis/ (last visited Mar. 19, 2025).

[20] *Zelis for Third Party Administrators*, Zelis, https://www.zelis.com/built-for/payers/third-party-administrators/ (last visited Mar. 19, 2025).

60.     Zelis' network-related expertise applies to "any type of network program," even workers' compensation."[21] Zelis' network business also includes dental networks: "Zelis takes an integrated approach to reduce the cost and complexity of managing your dental network . . . ."[22] Zelis also confirms that it has its own national dental provider network: "Leveraging *our* national dental provider network increases network access and savings for your practice."[23] (emphasis added).

61.     Further, with respect to dental networks, Zelis describes itself as "the market leader" in dental network services.[24] Zelis notes that it has "the full suite of solutions for dental payers: Network Analytics, Network Design, Network Access and Savings, Payments and Communications."[25]

## III.     The "Repricing" Services Offered by Zelis

### A.     Zelis' Repricing Services

62.     On a simplified basis, Zelis' "repricing" tools function as follows.

63.     Emergency Context: With respect to emergencies, a patient insured by one of Zelis' Insurer clients/competitors receives emergency services from a Provider (*e.g.*,

---

[21]     *Zelis for Property & Casualty*, Zelis, https://www.zelis.com/built-for/payers/property-and-casualty-plans/ (last visited Mar. 19, 2025).

[22]     *Zelis for Dental Payers*, Zelis, https://www.zelis.com/built-for/payers/dental-payer/#:~:text=Zelis%20takes%20an%20integrated%20approach,care%20at%20the%20right%20price. (last visited Mar. 19, 2025).

[23]     *Id.*

[24]     *Id.*

[25]     *Id.*

Plaintiff), and the Provider submits a claim to the Insurer for emergency services rendered. If that Provider does not have a pre-existing contract governing payment for emergency services with that Insurer, the Insurer remains obligated to pay. Instead of paying the claim directly, the Insurer sends it to Zelis. Zelis applies its analytics tools to "reprice" the OON claim pursuant to their repricing agreement. Zelis then presents the Provider's now-repriced (downwardly adjusted) claim on a take-it-or-leave-it basis. If the Provider does not accept the "repriced" amount, the best the provider can hope for is to engage in time-pressured and one-sided negotiations or an appeal. These options often result in delayed payment of the original OON claim or a further decreased amount.

64.    Non-Emergency Context: A similar sequence exists for payment of non-emergency OON claims. When a patient seeks healthcare services from an OON Provider in a non-emergency setting, the OON provider has no obligation to treat the OON patient. But OON care routinely occurs, at least partly based on the understanding that the patient has some kind of health insurance and the Provider will be able to recoup at least some of the costs of that healthcare from that insurer on an OON basis. As explained above, Zelis then applies its analytics tools to "reprice" (that is, downwardly adjust) the claim.

**B.    Zelis' Established Reimbursement Solution®, so-called "Market Pricing"**

65.    Zelis has compiled a proprietary fee schedule, designated as its "Established Reimbursement Schedule" ("ERS"). *Butler v. Unified Life Ins. Co.*, 1:17-cv-00050, 2019 WL 5302491 (D. Mont. Aug. 9, 2019), ECF 88-9 at 7. Misleadingly, Zelis refers to ERS as

"Market-based Pricing."[26]

66.     As explained by David Scanlan, Allied National, Inc.'s Director of Claims, Zelis' ERS offering is partly made up of "aggregated carrier based PPO rates, and known provider PPO contract rates," which, when used to pay OON Providers, make an improperly-pooled and downwardly-biased payment data set. *Id.* at 7–8.

67.     Scanlan confirms that Zelis' "ERS is currently used . . . to price out-of-network/non-PPO claims." *Id.*

68.     Scanlan then described how CMS/Medicare payment rates are used and how ERS payment rates compare:

> Traditionally Medicare is not representative of a commercial plan's usual and customary payment. However, commercial plans often use a markup of Medicare (*i.e.*, Medicare plus 25% or 50%) as its rate. ERS on average yields a payment range as a percent of Medicare between 150% - 225%.

*Id.* at 9. By referencing Medicare prices in setting payment levels, Scanlan confirms that OON services can be discreetly priced through use of ERS.

69.     Scanlan then reported that

> [a]mounts paid on the claims by Allied based on the data Isight determinations are more than double the amount that would have been paid under Medicare guidelines, and are 90% of the amount that would have been paid under the ERS Zellis [sic] fee schedule representing market payment rates that providers typically accept as payment for services.

*Id.* at 10.

---

[26] *Market-based Pricing with Zelis*, Zelis, https://www.zelis.com/solutions/out-of-network-solutions/market-based-pricing/ (last visited Mar. 20, 2025).

70.     Further, Zelis' own Robert Jackson, Executive Vice President, Cost Management Solutions at Zelis Healthcare testified:

> ERS is a proprietary fee schedule product offered by Zelis, [which] uses—some of this is proprietary. It uses commercially available data sets that we purchase. It uses CMS or Medicare rate tables. We use our own claims data and PPO contracting data to build [a] market base[d] reimbursement schedule.

*Id.* at ECF 118-11, at 3 (Jackson Depo. at 10:3-8). Further, Zelis' Jackson testified that "[f]or clients that use the ERS product, we receive claims from those clients. And we will apply the fee schedule pricing contained within the ERS fee schedule to typically out-of-network claims." *Id.* (Jackson Depo. at 10:9-17). Mr. Jackson also testified that ERS is made up of "PPO contracting data." *Id.*

71.     Mr. Jackson further explained that Zelis' ERS product does not even "factor in" what healthcare providers charge for their services:

> Q:     Now, does Zelis' ERS fee schedule is based [sic] upon what providers agree to accept as opposed to what providers charge; is that accurate?
>
> A:     That is correct.
>
> Q:     Does the Zelis' ERS Fee Schedule even factor in what providers actually charge for the services?
>
> A:     No.

*Id.* at ECF 146-2, at 3 (Jackson Depo. at 19:17-19:23).

**C.    Zelis' Reference-Based Pricing ("RBP") Service**

72.     Beyond ERS, Zelis uses an RBP solution for repricing, which allows the insurer to base repricing amounts on a reference such as Medicare prices.

73.    Zelis markets RBP services as "[g]iv[ing] control back to your members by setting maximum reimbursement amounts using pre-defined prices to provide a controlled savings model."[27] Zelis further explains that "Zelis Open Access Pricing® (RBP) sets maximum reimbursement amounts using pre-defined prices . . . ."[28]

74.    According to Zelis' Kaitlin Howard, "[r]eference-based pricing sets a price limit on certain medical services based on a reference point, such as the Medicare reimbursement rate or the average cost of the service in a particular geographic area."[29] Ms. Howard provides a specific example of how RBP functions: "For example, the cost variance of an MRI might range between $800 - $4,000 (or more). But one could argue that the quality of the procedure and care provided is essentially the same. RBP eliminates the price variance with a set amount . . . ."[30] Ms. Howard then confirms that Zelis' repricing services can accommodate collusively-set and specified pricing: "Bottom line: RBP gives the control back to members *by setting maximum reimbursement amounts using pre-*

---

[27]    *Elevate member experience with Zelis*, Zelis https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/#:~:text=Give%20control%20back%20to%20your,regulatory%20updates%2C%20and%20process%20pricing (last visited Mar. 19, 2025).

[28] *Id.*

[29] Kaitlin Howard, *Reference-Based Pricing (ARBP): An overview*, Zelis (Apr. 27, 2023),https://www.zelis.com/blog/rbp-an-overview/#:~:text=Reference%2Dbased%20pricing%20sets%20a,%E2%80%93%20$4%2C000%20(or%20more) (last visited Mar. 19, 2025).

[30] *Id.*

*defined prices* to provide a controlled saving model."[31] (emphasis added). Ms. Howard then observed that RBP's pre-defined pricing feature allows Zelis' "clients [to] save up to 28% more than a traditional network plan and realize roughly 73% of savings on individual healthcare claims."[32] RBP is used to apply traditional, collusively-determined price amounts, pricing percentages, or price levels.

75.    Zelis is crystal clear about its intent in working with others to set prices: "The intent is to provide an effective tool to help stabilize the healthcare claims costs."[33] (emphasis added). Zelis hopes that its "effective tool to help stabilize the healthcare claims costs" will "have a far reaching, ripple effect throughout the entire healthcare industry."[34]

76.    Zelis again confirms the intended effectiveness of its RBP repricing service, noting that "2MM+ RBP claims [are] repriced annually"; that its RBP repricing service has resulted in "97% retained savings"; and that it has "<4% member and provider inquiry rate."[35] Zelis further boasts its extensive experience in providing RBP services by noting its "15 years providing RBP solutions."[36]

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.* at n.27.

[36] *Id.*

77.    Whether using ERS or RBP, a specified percentage, amount, or ceiling included in an insurance policy can be accommodated by Zelis' repricing analysis. For example, no matter what Zelis calculates as the repriced amount via its ERS or RBP methodologies, such methodologies can still be applied to an insurance policy's "Maximum Allowable Cost" ("MAC")—including a collusively-determined MAC amount.[37]

## D.    Zelis' Repricing Amounts Are Not Proposals, Recommendations, or Suggestions

78.    Zelis boasts that Insurers retain Zelis' repricing amounts approximately 97% of the time for its ERS product by providers.[38] These acceptance rates result from the widespread agreed-upon participation (including by some 770 Insurers).

79.    Because of the widespread adoption of Zelis' tools, technologies, and methodologies, Providers have no reasonably available or practical alternatives and virtually no negotiation leverage from which to upwardly adjust repriced claims.

80.    Zelis' repricing communications and Insurer adoption rates allow for a finding of Zelis' joint and several liability for the price-fixing efforts of all members of the conspiracy.

81.    Zelis' downward-adjusted payment amounts are based on a delegation of authority by Insurers to their repricing agent, Zelis, as part of their repricing contracts.

---

[37] *Id.*

[38] *Id.* at n.27.

Indeed, a director of Allied National, Inc. (an Insurer) filed a rebuttal report with the District of Montana confirming that Zelis determines the repricing amount: "Zelis matches the claim to an eligibility file provided by Allied. If a match is found, *Zelis determines the reasonable and customary (R&C) charge for the medical service at issue*." *Butler*, 1:17-cv-00050 (D. Mont. Sept. 5, 2018), ECF 101-5 (Scanlan Rebuttal Report), at 1 (emphasis added).

82.    In the vast majority of repricings, the Insurer authorizes Zelis to make the repricing offer and negotiate the OON claim on the Insurer's behalf—automatically and in complete abdication of the Insurer's pricing authority to Zelis (a horizontally-positioned competitor in the PPO Network space).[39] This abdication of pricing authority to a horizontally-positioned competitor itself violates Section 1 of the Sherman Act.

83.    Zelis' communications of its repriced OON payments do not represent just a beginning or starting point to a pricing negotiation. In the vast majority of circumstances, the repricing communication is the final, take-it-or-leave-it amount.

### E.    Zelis' Post-Repricing Claims Negotiation and Appeals Process

84.    Zelis conflates a Providers' acceptance of its repricing amounts with an absence of inquiry. For example, Zelis advertises that its ERS service results in an inquiry

---

[39] Even if the communicated payment could be considered a mere recommendation or a proposed starting point for a subsequent multi-round OON payment-related negotiation, such a price-fixed starting point remains illegal price fixing. *See In re Google Play Store Antitrust Litig.*, No. 21-md-02981-JD, 2022 WL 172587, at *12 (N.D. Cal. Nov. 28, 2022) (explaining that price fixing impacts all market participants even when prices are individually negotiated).

rate of under ten percent and its RBP service as having a "<4% member and provider inquiry rate."[40]

85.    With respect to its OON claims solutions, Zelis claims to offer "Expert Negotiations," which it characterizes as providing the ability to "[b]lend human expertise and advanced technology to deliver high quality savings by identifying the right claims for negotiation after services have been rendered."[41] Zelis also claims to have "25 years' experience with provider negotiation, contracting and settlement."[42]

86.    Zelis shows that its claims negotiations result in even greater savings for the insurer: "We use advanced technology to identify eligible claims, averaging 60+% savings *from negotiations*." (emphasis added).[43]

87.    To the extent that a Provider objects to the repriced payment amounts, otherwise responsible Insurers enforce Zelis' pricing determinations and evade upwards adjustments by referring objecting Providers back to Zelis.

## IV.    The Relevant Geographic and Service Markets.

88.    Plaintiff defines the applicable product and geographic markets as follows.

---

[40] *Id.*

[41] *Claims Negotiations with Zelis*, Zelis, https://www.zelis.com/solutions/out-of-network-solutions/out-of-network-claims/ (last visited Mar. 19, 2025).

[42] *Id.* at n.27.

[43] *Id.* at n.46.

**A.    Relevant Geographic Market**

89.    The relevant geographic market is composed of all fifty States of the U.S., the District of Columbia, and all U.S. territories where providers are paid for OON services by Zelis or Insurers.

**B.    Relevant Product Market**

90.    The relevant product market is the market for OON healthcare services offered by Providers as defined herein.

91.    A "product market" can consist of services (a "service market"), as alleged herein.

92.    In the context of Clayton Act enforcement, a "cluster" of services can support a product or service market definition. *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 356 (1963) (footnotes and internal quotation citation); *see also United States v. Phillipsburg Nat'l Bank & Trust Co*., 399 U.S. 350, 361 (1970) (footnote omitted).

93.    Zelis and others have treated the market for OON healthcare services sold by Providers and paid for by Insurers as a distinguishable and supportable market for purposes of defining a relevant product or service market.

94.    The OON insurer market is also a separate, distinguishable market from the general private commercial insurance market, which includes both OON healthcare services and the payment of in-network healthcare services. Private, in-network healthcare services are often paid by insurers as part of a PPO.

95.    The OON insurer market is comprised of a bundle or "cluster" of healthcare products and services. A patient may undergo various tests and procedures, sometimes in

combination, which would not be practical or reasonable to negotiate on a test-by-test, procedure-by-procedure, or an in-combination basis. Further, such diagnostic-steps and/or treatments might need to be applied serially, in a specific sequence, or within a specific timeframe, rendering it impossible for a patient to negotiate on a service-by-service basis. A cluster or bundle-based product or service market is the appropriate framework here.

96.    As access to certain providers or procedures is often unavailable within a given PPO, in-network services and OON services are not reasonably interchangeable.

97.    Indeed, Zelis treats the OON insurer market as a separate, distinguishable market, legally sufficient for antitrust purposes. For example, as illustrated below, Zelis separates its "In-Network Pricing" offerings from its "Out-of-Network Solutions":

 **Network Solutions**
Build, maintain, and optimize
competitive, high-performing networks.

 **Out-of-Network Solutions**
Uncover significant savings with a
layered approach.

OON and in-network solutions are distinct areas of Zelis' "purpose-built solutions."[44]

98.    Moreover, others, including David C. Lewis, Principal of Milliman (previously one of the providers of healthcare-related data to Zelis), have recognized the relationship between Insurers and OON providers to be a market. Emphasizing the control of OON costs as an overall component of an insurer's business, Mr. Lewis noted that:

> Commercial out-of-network (OON) provider reimbursement is a topic
> of great debate in healthcare. Changes on both the payer and provider
> sides have produced a large disparity *in the OON payment levels*

---

[44] *Solutions*, Zelis, https://www.zelis.com/solutions/network-solutions/ (last visited Mar. 19, 2025).

pursued by each. Payers seek ways to limit growth in *OON costs* while providers look to maintain revenue *in a market* with increasing pressure to accept lower payments.[45]

(emphases added).

99.    As Zelis and at least one of its data brokers have treated the OON insurer market as a separate, distinguishable market, it is appropriate to regard this market as a sufficient basis, to the extent necessary, to plead a Sherman Act violation.

**C.    Zelis Has Market Power and Monopsony Power in the Relevant Market.**

100.    A plaintiff is not required to assert that defendants possess market, monopoly, or monopsony power to allege a price-fixing violation of Section 1 of the Sherman Act. Nevertheless, as outlined below, Zelis possesses market power and monopsony power.

101.    First, on a transaction basis, Zelis explains that its payments platform, Zelis Advanced Payment Platform ("ZAPP"), "supports all payment modalities . . . and communications," and which "delivers payments to 750k+ providers," "delivers more than $240B in payments to providers," and "processes 1B payment transactions annually."[46] Zelis notes that it is responsible for "$100B claims priced annually" and "$229B payments

---

[45] David C. Lewis, *The changing landscape of out-of-network reimbursement*, Milliman (Sept. 2018), https://edge.sitecorecloud.io/millimaninc5660-milliman6442-prod27d5-0001/media/Milliman/importedfiles/uploadedFiles/insight/2018/changing-landscape-oon-reimbursement.pdf at 1 (last visited Mar. 19, 2025).

[46] *Modernize your healthcare payments & communications*, Zelis, https://www.zelis.com/solutions/payments-optimization/ (last visited Mar. 20, 2025).

processed annually," "resulting in $27B claims cost savings."[47] Zelis has also asserted that it delivered "800 million claims communications…"[48]

102.    In terms of business relationships, Zelis asserts that it "works for 770 health insurance companies, ranging from national carriers and dental plans, to BCBS and regional plans, to third-party administrators."[49] Zelis maintains a "platform [that] serves . . . the top 5 national health plans."[50] According to the American Association of Medical Colleges ("AAMC"), "*[o]verall, our data show that . . . the top three large-group insurers hold an average of 82.2% of the market share in each state*."[51] (emphasis in original).

103.    Based on its business relationships with the top 5 national health plans and Zelis' available transaction-related data, it is reasonable to conclude that Zelis' market share in the OON insurer market is significantly above 65.5%, and likely above 82.2%.

---

[47] *Id.*

[48] *Id.*

[49] *Your success is our success*, Zelis, https://www.zelis.com/built for/#:~:text=Zelis%20works%20for%20770%20health,balance%20access%20with%20financial%20performance (last visited Mar. 19, 2025).

[50] *Id.* at n.14.

[51] *See AAMC study examines the impact of health care consolidation in state,* American Hospital Association (May 1, 2024), https://www.aha.org/news/headline/2024-05-01-aamc-study-examines-impact-health-care-consolidation-states (last visited Mar. 19, 2025).

104.    According to the National Association of Insurance Commissioners ("NAIC"), "[t]he number of health insurers filing the health statement type with the NAIC increased to 1,176 from 1,165 in 2022."[52]

105.    Moreover, according to the AAMC Research and Action Institute analysis, there continues to be significant insurer consolidation, giving rise to "concern among policymakers about increasing consolidation in the U.S. health care system."[53]

### D.    Anticompetitive Acts and the OON Payment Suppression Conspiracy

### 1.    Zelis and its Co-Conspirators Have Executed an Information-Sharing, Price-Fixing, and OON-Payment-Suppression Conspiracy.

106.    According to Zelis' CEO, "[t]ransforming the healthcare consumer experience requires collaboration among *all of us*."[54] (emphasis added).

107.    Zelis and other Insurers are direct competitors that have agreed to join, establish, enable, operate, further, preserve, and conceal the OON payment conspiracy based in part on commonly-applied methodologies and technologies for the suppression of

---

[52] *U.S. Health Insurance Industry Analysis Report*, NAIC (Dec. 2023), https://content.naic.org/sites/default/files/topics-industry-snapshot-analysis-reports-2023-annual-report-health.pdf at 1 (last visited Mar. 19, 2025).

[53] *See* Atul Grover, MD, PhD, et al., *Why Market Power Matters for Patients, Insurers, and Hospitals*, AAMC (May 1, 2024), https://www.aamcresearchinstitute.org/our-work/data-snapshot/why-market-power-matters (last visited Mar. 19, 2025).

[54] Amanda Eisel, *The Data Revolution: Coming to a Healthcare Industry Near You*, Zelis (Sept. 27, 2023), https://www.zelis.com/blog/the-data-revolution-coming-to-a-healthcare-industry-near-you/ (last visited Mar. 19, 2025).

payments for claims submitted for OON services, which has unreasonably restrained trade relating to payments made to Providers for OON services.[55]

108.   Zelis has entered into numerous written agreements with hundreds of its horizontally positioned Insurer competitors to exchange confidential, proprietary, and competitively sensitive claims, payment, repricing, and contractual data so as to collusively suppress payments and payment thresholds for claims submitted for OON services and to fix the payment amounts for claims by Insurers for OON services.

109.   These agreements require these horizontally positioned competitors to share their claims, payment, repricing, and contractual data with Zelis in return for Zelis' repricing algorithms, tools, and/or methodologies to suppress payments for OON services.

110.   The use of such third-party or agent-based pricing algorithms and/or methodologies is price-fixing when a competitor knows or can readily access information confirming that the algorithm, tools, and/or methodology is based on claims, pricing, or contractual information submitted by competitors. For example, federal antitrust and competition regulators regard "replac[ing] once-independent pricing decisions with a shared algorithm"—just as members of the Zelis conspiracy have accomplished—as illegal price-fixing.[56]

---

[55] As a reminder, Zelis builds, operates, and manages PPO Networks and provides repricing services. Further, several insurers own, operate, and/or manage PPO Network businesses.

[56] *See Duffy v. Yardi Sys., Inc.*, No. 2:23-cv-01391, ECf No. 149 (W.D. Wash. Mar. 1, 2024) (Statement of Interest of the United States of America at 2–3) (when "competitors

111.    Members of the Zelis conspiracy harmed competition by delegating to Zelis industry-wide pricing and negotiating authority concerning the payment of claims submitted for OON services. Independent, individualized negotiations between providers and Insurers are thus made impossible (or a hopeless exercise), suppressing OON payments far below what they otherwise would be.

112.    Conspiracy members were able to effectuate the Zelis conspiracy by basing OON payments on confidential information shared between and among each other, and through Zelis.

### 2.    Agreements to Conspire and Share Competitively Sensitive Information Between and Among Zelis and Insurers

#### a.    Agreements to Conspire to Suppress OON Payments and to Share Information

113.    To advance the conspiracy, (1) Insurers directly shared competitively sensitive business information ("CSI") between and among each other; (2) Insurers shared CSI with Zelis; (3) Zelis shared CSI with Insurers; and (4) Insurers shared CSI *through Zelis* to other Insurers.

114.    This matter concerns a conspiracy between Zelis and Insurers to jointly reprice payments to Providers submitting claims for performing OON service. When Zelis obtains private, confidential, hidden-to-the-public, and commercially sensitive CSI from hundreds of Insurers involving over $240 billion in payments to Providers, it obtains

---

jointly delegat[e] key aspects of their decision-making to a common algorithm," they "deprive the marketplace of independent centers of decision-making").

knowledge about claims and pricing of OON services from a substantial portion of the OON Insurer market. Accordingly, Zelis' Insurers are able to pay Providers an artificially and collusively suppressed price for OON services as there are actually or virtually no payment sources for OON Providers to which to turn as all or nearly all Insurers are also participants in Zelis' OON price-fixing conspiracy.

115.    Zelis' OON repricing amounts are based in part on the claims, pricing, and methodologically related information shared by other repricers. Through agreements these repricers have with each other, Insurers can use the relationship they have with one repricer to gain access to claims and pricing-related information managed by another.

116.    Zelis engages in verbal, written, and electronic-based sharing of information, including claims, pricing, and contract-related information, with its Insurer clients.

### b.    Verbal Information Sharing/Opportunity to Conspire

117.    Among other events and meetings, Zelis hosts an "annual conference" where health insurer personnel are invited to discuss the industry and Zelis' offerings with other existing and potential health insurer clients. These verbal communications have been captured on film. *See infra* Part IV. (E)(9)(f), (detailing the "Zelis Forum").

### c.    Written and Contract-Based Information Sharing

118.    Further, Zelis engages in written agreements that contemplate the sharing and access to competitively-sensitive information, including claims, repricing, and contractual information.

119.    Zelis boasts that its RBP pricing product can "[i]mprove accuracy and reduce frustration with *a technology-enabled way to load and manage contracts*, apply real-time edits and regulatory updates, and process pricing."[57] (emphasis added).

120.    Zelis also maintains a "Payment Harmonization Index," developed from a quantitative survey of 214 healthcare payer executives, 75% of whom worked at health plans, and the remainder at TPAs.[58] According to Zelis, the index "highlights findings from payment accuracy executives to offer an outline for the next wave of payment integrity and cost containment."[59]

### d.    Electronic Information Sharing

121.    Finally, Zelis and its Insurer clients have technological relationships, which enable electronic sharing of claims, pricing, and contract-related information.

122.    Supporting the existence of its electronic platform for sharing such claims and pricing information, Zelis boasts that it has a "99% auto adjudication rate" and uses

---

[57] *Discover new savings strategies while empowering members*, Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/#:~:text=Zelis%20Open%20Access%20Pricing%C2%AE,regulatory%20updates%2C%20and%20process%20pricing (last visited Mar. 19, 2025).

[58] *Payment Harmonization Index*, Zelis, https://www.zelis.com/white-papers/payment-harmonization-report-2022/(last visited Mar. 19, 2025).

[59] Kaitlin Howard, *Payment Integrity and Cost Containment in Healthcare: A Payment Harmonization Benchmark*, Zelis (Jan. 5, 2023), https://www.zelis.com/blog/payment-integrity-and-cost-containment-in-healthcare-a-benchmark/ (last visited Mar. 19, 2025).

"ADI, EDI, or portal integration to make repricing claims easier."[60] As a result, Zelis boasts that it repriced "82M+ claims . . . in 2023," alone.[61] Further, its capabilities allow Insurers to "[a]utomate claims pricing & strengthen provider contracting negotiations."[62]

123.    Zelis claims that its information system works with other claims systems. As explained by Zelis, its systems "[i]ntegrate with numerous claims systems, including FACETS, to enables [sic] more efficient implementations and workflows."[63]

124.    Zelis' platform allows for sharing information found within contracts. For example, Zelis' platform includes the "[a]bility to load contracts on your behalf" and provides "[r]obust reporting & in-depth contract analysis."[64] Zelis notes that Insurers can "[l]everage *our source pricers for all direct agreements, including Medicare, Medicaid, commercial,* and other government programs. We'll load and maintain client contracts & fees schedules, manage the contract inventory, *and price claims against them for all plan*

---

[60] *Track the path of every claim with a fully transparent process trail*, Zelis, https://www.zelis.com/solutions/in-network-pricing/ (last visited Mar. 19, 2025).

[61] *Id.*

[62] *Id.*

[63] *Id.* at n.12.

[64] *Gain claims pricing accuracy and transparency with Zelis*, Zelis, https://www.zelis.com/solutions/in-network-pricing/#:~:text=Advanced%20claim%20pricing%20methodologies,them%20for%20all%20plan%20types (last visited Mar. 24, 2025).

*types*."[65] (emphases added). As emphasized by Zelis, "[w]e'll even load contracts for you." Zelis' electronic capabilities allow for the analysis and sharing of loaded contracts.[66]

125.    Zelis admits that its electronic sharing capability layers the data from one PPO with that from other competing PPOs: "Our proven data analytics platform leverages provider and competitor data with the ability to layer in additional data elements from your organization or our partners . . . ."[67]

126.    Further, Zelis explicitly describes how its improperly pooled information can be used: "Disruption—Gain a competitive edge in the sales process *with integrated competitor data* within your disruption analysis—*benchmark against competition* to underscore your strengths and proactively mitigate weaknesses."[68] (emphases added).

127.    Virtually, if not actually, admitting that its data sets are based on collecting competing Insurers' information, "Zelis collects data from *hundreds of plans and thousands of networks* . . . . Zelis specializes in organizing and managing this data to support network analytics that you can rely on."[69] (emphasis added). According to Zelis, this process, dubbed "The Zelis Provider Network Data Process,"[70] occurs as follows:

---

[65] *Id.*

[66] *Id.*

[67] *Create innovative and competitive network structures*, Zelis, https://www.zelis.com/solutions/network-solutions/ (last visited Mar. 19, 2025).

[68] *Id.*

[69] *Id.*

[70] *Id.*



128.   For its RBP service, Zelis acknowledges that it can "[i]mprove accuracy and reduce friction with a technology-enabled way to load and manage contracts, apply real-time edits and regulatory updates, and process pricing."[71]

129.   Zelis' CEO explained that Zelis is "aggregating and analyzing data and putting it back into the hands of payers, providers, and consumers. More specifically, Zelis is optimizing data to help payers easily assess, *benchmark* and create high-performing networks based on costs, access and quality."[72] (emphasis added). Additionally, Zelis "download[s] and process[es] about 27 terabytes of MRF [machine-readable file] data each month for just the top four payers."[73] Zelis shares this information back to Insurers.

### 3.   Agreements to Share CSI and Conspire between Repricers

130.   In summary, competitors and Zelis worked together to suppress OON payments in various ways. Competitors conspired with Zelis and make use of Zelis' proprietary fee schedule. Zelis issued repriced claims based on competitors' repricing

---

[71] *Id.* at n.61.

[72] *Id.* at n.58.

[73] *Id.*

software. Through agreements Zelis had with its competitors, Zelis allowed its customers to access claims and pricing-related information maintained by its competitors. And the direct rivals worked together to process claims.

### 4.    Insurers Share CSI and Other Related Information with Each Other

131.    Insurers share confidential, proprietary, and competitively sensitive information directly with each other.

### 5.    Insurers' Sharing of CSI with Zelis and Using Zelis to Set Prices While Knowing Their Competitors Are Doing the Same Is Price Fixing

132.    In violation of the Sherman Act, Zelis shares CSI with other Insurers, including typical, standard, default reference amounts or percentages, and specific override MAC amounts or percentages; and horizontal competitors share private, confidential, "proprietary," and/or competitively-sensitive information.

133.    Further, when Insurers use Zelis' algorithms and/or A.I. to set prices, it is also price-fixing and coordinating price suppression.

134.    Insurers know, or should know, that their competitors are similarly transmitting information to Zelis to obtain repricing information based on disclosures made by Zelis as included on its websites.[74] If an Insurer is not using Zelis' repricing services, they are among the few who are not.

---

[74] This determination as to the existence of price-fixing is readily reachable as Zelis publicizes on its website that the "top 5" of the nation's health insurers and approximately 770 others are customers of Zelis and use Zelis' repricing services.

6.    **Insurers' Widespread Adoption of Zelis' Repricing Services Have Harmed Competition by Precluding Competitive Alternatives**

135.    The pervasive adoption and application of Zelis' tools, technologies, and methodologies have harmed competition in the OON insurer market.

136.    With such widespread adoption and application, Defendants have harmed competition and have left OON Providers with actually or virtually no available alternatives from which to seek better pricing.

137.    The Zelis conspiracy is a *per se* violation of Section 1 of the Sherman Act. As a *per se* violation involving conduct that is inherently wrong, the law contemplates no procompetitive excuse.

7.    **The Zelis Conspiracy's Existence Is Supported by Direct Evidence of Written Agreements Entered into Between Conspirators**

a.    ***Direct Evidence of Agreements between Zelis and Other Insurers***

138.    Teton County's healthcare benefit plan manager, Allegiance Benefit Plan Management, Inc., contracted with Zelis for repricing services. The Board of Teton County Commissioners considered "[a] pass through fee to Zelis based on Allegiance's contract with Zelis for services related to claims editing and payment integrity."[75]

---

[75] *Board of County Commissioners – Clerk Report*, Teton County, Wyoming (Apr. 9, 2024), https://www.tetoncountywy.gov/DocumentCenter/View/28962/0409-02-Allegiance-Benefit-Plan-Management-Agreement#:~:text=Zelis:%20A%20pass%20through%20of%20fees%20to,age%20residing%20in%20the%20state%20of%20Massachusetts\ (last visited Mar. 19, 2025).

139.    PacificSource Health Plans, a "health plan serving the Northwest since 1933," acknowledges that it "has an agreement with Zelis for high-dollar out-of-network negotiations."[76]

140.    In a Winco Holdings, Inc. Employee Benefit Plan, Zelis Healthcare is listed as Winco's "Dialysis Cost Containment Program Administrator," providing "Repricing, Pre-authorization & Network" services.[77] Winco acknowledges that its "Plan has entered into an agreement with a third-party Dialysis Cost Containment Program Administrator for purposes of repricing, prior authorization, utilization review, and case management."[78]

141.    In *Cal. Spine & Neurosurgery Inst. v. Agilent Techs., Inc.*, it was shown that Zelis sent provider San Jose Neurospine a settlement proposal listing Anthem Blue Cross & Blue Shield as the payor, in addition to the repricing amount. No. 5:24-cv-05248-EJD (N.D. Cal. August 16, 2024), ECF No. 1-11 (Ex. 1) ("*Cal. Spine*"). The fax includes the following footer: "This facsimile has been sent by Zelis Healthcare, LLC ("Zelis") to those with an interest in the services provided by Zelis under *our established business relationship*." (emphasis added). *Id*.

---

[76] https://pacificsource.com/article/new-eft-payment-faq

[77]    *Employee Benefit Plan*, Winco Holdings, Inc. (Jan. 1, 2021), https://benefits.wincofoods.com/wp-content/uploads/Winco-SPD-2021.pdf at 4 (last visited Mar. 19, 2025).

[78] *Id.* at 38.

8. **In Addition to Direct Evidence, Abundant Indirect and Circumstantial Evidence Supports the Existence of the Zelis Conspiracy**

   a. **Indirect Evidence and "Plus Factors" Corroborate the OON Conspiracy**

142. The OON insurer market is characterized by at least the following "plus factors," which likely can only be explained by the existence of conspiracy:

   a. Collectively high market concentration of conspiracy members;

   b. High barriers to entry;

   c. Sufficient motives to conspire;

   d. A history of prior collusion;

   e. Numerous opportunities to collude;

   f. Actions taken against self-interest;

   g. Conspiracy enforcement mechanisms;

   h. Pervasive, systematic, and contract-based requirements to exchange CSI; and

   i. The existence of customary patterns and courses of dealing.

When considered along with repricing agreement evidence, these "plus factors" support the presence of a horizontal price-fixing and price suppression agreement.

   b. **Collectively High Market Concentration of Conspiracy Members**

143. The applicable geographic market includes all fifty States of the U.S. of America, the District of Columbia, and all U.S. territories. The relevant product/service market is the "OON insurer market." On a number-of-Insurers basis, where Zelis counts 770 Insurer customers (out of approximately 1,176 insurer entities), Zelis has a market share of approximately 65.5%. When considering the unequal size and financial strength

of these Insurers, that Zelis counts the top 5 national plans among its customers, and that studies show that industry consolidation has left the nation's top three Insurers with an average of 82.2% market share in each State of the U.S., Zelis' market share on a transaction basis is necessarily much higher than 65.5%.

144.    This market power has enabled the Zelis conspiracy to impose anticompetitive effects in the relevant market and is circumstantial evidence of a conspiracy.

### c.    The Market's High Barriers to Entry

145.    Entrance into the OON insurer market is hindered by high barriers. New market entrants must be able to bear large expenditures of both time and money necessary to develop a network of healthcare providers large enough to compete against other Insurers. Even without developing a corresponding PPO, there are significant capital outlays required to operate as an insurer. Entrants must contend with staggering economies of scale that large, incumbent, nationwide health Insurers possess. Obtaining name recognition in an industry occupied by longstanding and well-recognized players presents an additional major hurdle.

146.    There is also an actuarial risk for new health insurance-related networks. Participating health Insurers need a stable of healthy premium-paying subscribers to counteract the costs associated with those subscribers needing healthcare services.

147.    As a result of such barriers, the established players in this industry are further entrenched and protected by participating in the Zelis conspiracy. Also, a new entrant who might decide against participating in the OON payment conspiracy places itself at a

significant competitive disadvantage: its impact on the market would likely be so small that it would not be able to undermine the Zelis conspiracy members' collective ability to impose repriced payment amounts for OON healthcare services.

148.    Moreover, a market entrant seeking to replicate Zelis' repricing services would need significant funds to make the cash outlays necessary to purchase or develop source code, algorithms, and software to manage mass information. The new entrant would also need funds and staff available to make updates to the technology; and to hire and train a staff that can, in turn, provide training and support to customers such that the new technology could effectively reprice OON claims and displace existing repricing incumbents—all without infringing on patents, copyrights, trademarks, and other protectible intellectual property as owned, possessed, or controlled by existing repricers.

### d.    Motives To Conspire

149.    The desire for increased revenue and to avoid public scrutiny of unfair claims payment practices incentivize and motivate existing and would-be participants to conspire.

150.    First, Zelis and its competitors have the exact same and exceptionally strong financial incentive to conspire: Zelis and competitors both receive a percentage of the difference between the amount billed by providers and the amount ultimately paid by the Insurers. Zelis thus has a strong incentive to offer the lowest payment possible.

151.    For example, Auxiant's Administrative Services Health Care Proposal "includes claims surveillance technology which seeks to achieve additional cost savings for the plan. (Zelis Fee 25% of Savings). Proposal also includes . . . Non-Network Usual

Reasonable Customary Reference Based Pricing (RBP) program. *The fee for this service is 18% of savings.*"[79] (emphasis added).

152. Also, TPAs often pay themselves—just like the repricer—a percentage-of-savings-based shared-savings fee or processing fee, resulting in significant revenue. UnitedHealthcare executives have indicated that these fees generate approximately $1 billion annually for the company.[80] These fees may exceed amounts paid to providers.

153. Insurers are just as financially motivated to minimize payments to OON providers. From a profitability standpoint, the less Insurers pay providers, the better return on their overall insurance business.

154. Insurers' interest in avoiding legal scrutiny for developing their own repricing efforts is another motive to conspire. In an internal email, Cigna's Chief Risk Officer, Eva Borden, explained that Cigna "cannot develop these charges internally (think of when Ingenix was sued for creating out-of-network reimbursements)."[81]

---

[79] *Health Care Proposal*, Auxiant (Jan. 1, 2025), https://mccmeetingspublic.blob.core.usgovcloudapi.net/jacksonmo-meet-14d63987732c418594f89293ddf69c11/ITEM-Attachment-001-e973084e45804526bc402c0fb382af2b.pdf at 2 (last visited Mar. 19, 2025).

[80] As FAIR Health charges a flat fee, such "savings fees" and "processing fees" can be mostly or entirely avoided by self-insured entities and self-funded plans. No wonder insurers have strongly encouraged employers to abandon their previous reliance on FAIR Health.

[81] Chris Hamby, *Insurers Reap Hidden Fees by Slashing Payments. You May Get the Bill*, New Your Times (Apr. 7, 2024). https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills.html (last visited Mar. 20, 2025).

155.    These co-conspirators and their corporate ancestors have a shared history of engaging in price-fixing and the collusive suppression of payments made to providers for OON healthcare services.

### e.    Opportunities To Conspire

156.    Zelis and its Insurer clients participated in and had numerous opportunities to share information and to engage in coordinated efforts to establish, further, preserve, or conceal the OON payment conspiracy, including Zelis' own facilitation of communications among competitors.

157.    Zelis participates in a variety of healthcare conferences organized by others.[82]

158.    In addition, Zelis hosts an extravagant, annual "Zelis Forum," most recently held on May 13–15, 2024, at the Hyatt Regency Lost Pines Resort and Spa in Austin, Texas, featuring a comedy performance by Jason Sudeikis. [83] Zelis Forum 2024 brought together "500 Zelis clients and partners."[84] According to Zelis' Erin Brophy, "[e]ach year, we strive

---

[82] These conferences include the SIIA (Self-Insurance Industry Association Spring) Forum, March 25-27, 2024 at the JW Marriott Hill Country Resort & Spa in San Antonio, Texas; the SIIA Connect National Conference in Phoenix on October 8 through 10, 2023; and the 2024 National Medicare Advantage Conference, November 4-5, 2024 at the Loews Vanderbilt Hotel in Nashville, Tennessee. Zelis also participated as an "Exhibitor" for the 2024 Annual Healthcare Financial Management Association ("HFMA").

[83] Claire Hoffman, *Most Innovative Meetings 2024: Zelis Forum*, BizBash (Nov. 18, 2024),https://www.bizbash.com/bizbash-lists/meetings-conferences/article/22925945/most-innovative-meetings-2024-zelis-forum#:~:text=The%20basics:%20Zelis%20Forum%202024,from%20its%20cutting%2Dedge%20technology (last visited Mar. 19, 2025).

[84] *Id.*

to dream up the unexpected, transforming every event into an experience our customers eagerly anticipate and remember long after."[85]

159.    With respect to opportunities to collude, several Insurers—including but not limited to Aetna, Centene, Cigna, Elevance, HCSC, and Humana—are members of AHIP (formerly, America's Health Insurance Plans). AHIP "plays an important role in bringing together member companies and facilitating dialogues to advocate on shared interests."[86] Of course, a "shared interest" among AHIP members is controlling OON payments to providers. AHIP hosts conferences, committee meetings, and board meeting multiple times a year, including non-public, closed-door meetings.

160.    Numerous Insurer executives hold positions on AHIP's Board of Directors, including Gil K. Boudreaux, President and CEO of Elevance; David Cordani, Chairman and CEO of Cigna; and Maurice Smith, President, CEO, and Vice Chair of HCSC.

### f.    Acts Against Corporate Self-Interest

161.    Members of the Zelis conspiracy acted against their own respective corporate interests. Agreements among Insurers and Zelis would—absent a conspiracy—be counter to the Insurers' own independent economic interests. If no other insurer had entered into a repricing agreement with Zelis, no OON Provider would perform services (possibly except

---

[85] *Id.*

[86]    *Overview    Brochure    2022*, AHIP    (Jan.    2022),    https://ahiporg-production.s3.amazonaws.com/documents/AHIP-Overview-Brochure-2022.pdf#:~:text=AHIP%20plays%20an%20important%20role%20bringing%20together,ahead%20to%20identify%20opportunities%20and%20challenges%20on at 3 (last visited Mar. 19, 2025).

for emergency treatment) for the one insurer that had entered into a repricing agreement with Zelis. The result would be a single insurer offering depressed and non-competitive OON payments, leading to its own destruction. So long as there is an active conspiracy where most or all Insurers use or apply Zelis' repricing services, however, such self-defeating effects are negated.

162.    In addition, the Insurers agreed to share with Zelis claims, pricing, or contractual information. Absent a conspiracy, a single insurer would ***never*** elect to share such competitively sensitive business information with anyone, much less a horizontally positioned payer.

### g.    Conspiracy-Enforcement Mechanisms

163.    One mechanism used to preserve participation by co-conspirators was to film participants, thus minimizing conspiracy defectors.

164.    Enforcement mechanisms are not always negative—carrots often work better than sticks. Repricers' conferences have regularly taken place at luxury resorts and hotels.

165.    Conspiracy members, including Zelis, have been successful in enforcing and preserving the OON conspiracy. With respect to RBP, Zelis boasts that it has a 120% client retention rate.

### h.    Exchange of Private, Confidential, Proprietary, and Competitively Sensitive Information by Conspiracy Members

166.    The conspiracy members' willingness to share CSI is based on the knowledge or analysis of readily accessible information indicates that their direct competitors have agreed to do the same, which has anticompetitive consequences.

167.    Zelis is using this claims and pricing data to share confidential pricing information among members of the OON conspiracy to fix and collusively suppress OON payments.

### i.    Pattern and Course of Dealing Engaged in by Conspirators

168.    The Insurers have an established history of forming, maintaining, and preserving a similar OON payment suppression conspiracy.

169.    Zelis stood at the ready to form, maintain, preserve, enforce, and conceal its conspiracy after the FAIR Health exclusive use period. Accordingly, Zelis proudly emphasizes the long-term nature of its relationships with Insurers. Zelis boasts that it "has been with you at the forefront of modernizing the business of healthcare for 20 years."[87]

### E.    Defendants' Efforts to Suppress Payments for OON Services Have Been Enormously Successful and Have Destroyed Competition in the OON Insurer Market.

170.    Payment amounts to Providers performing OON services have cratered following the FAIR Health five-year, exclusive-use period.

171.    The FAIR Health period contrasts starkly to the current situation where OON invoiced amounts are routinely cut.

---

[87] *Id.* at n. 11.

V.    **Each New Act by Defendants to Further or Preserve the Conspiracy Has Resulted in a Newly Started Violation Period and Efforts to Conceal the Conspiracy Have Tolled any Applicable Statute of Limitations**

   A.    **Zelis and the Other Insurers Are Engaging in a Continuing Antitrust Violation by Renewing Their Conspiracy with New and Independent Acts.**

   172.    During the Class Period, Zelis and the other Insurers continue to underpay Plaintiff and members of the Class. Each meeting (whether bilateral or multi-lateral), communication, episode of information sharing, and individual effort to "reprice" OON service claims is an overt act that begins a new statute of limitations as each new event advances the objectives of the Defendants' and co-conspirators' OON conspiracy.

   B.    **Fraudulent Concealment.**

   173.    The efforts, conduct, statements, and omissions taken to establish, further, and enforce the OON conspiracy were performed in secret and Plaintiff and class members could have had no knowledge of the conspiracy, whether actual, constructive, or otherwise. Zelis' collusive repricing efforts, as indicative of antitrust violations, to Plaintiff's awareness, have not been reported in the press and, so far, have evaded antitrust liability. There is no date of which Plaintiff is currently aware that has begun to run any applicable statute of limitations.

   174.    Throughout the Class Period, as defined below, Defendants effectively, affirmatively, and fraudulently concealed the conspiracy from Plaintiff and the other members of the Class.

   175.    Because the OON conspiracy was expansive, encompassing, and secret, there was no practical alternative to which Plaintiff or members of the Class could turn to

obtain greater payment for OON services. Because Insurers had insight into the repricing efforts by repricing rivals through Zelis, Plaintiff and members of the Class could not escape the impact of the Zelis conspiracy even through insurers using repricer competitors.

176.     Several examples and occurrences indicate that Defendants attempted to conceal the OON conspiracy:

- Facilitating concealment, while claiming its services as defensible (Zelis claims that its "Established Reimbursement Solution®" tool for OON claims solutions helps to "[m]aximize acceptance and minimize appeals with a pricing solution that delivers defensible, geographically and adjusted pricing recommendations.").[88]

- Zelis' seeking to avoid compliance with a subpoena in other litigation, asserting that its "pricing and repricing reports" are "confidential business information." *In re EthiCare Advisors, Inc.*, No. 20-1886 (WJM), 2020 WL 4670914, at *4, n.4 (D.N.J. Aug. 12, 2020) (citing *Peterson v. Cigna Health and Life Ins. Co.*, BER-1-518-18, N.J. Super. Ct. (Law Division) [ECF No. 24]).

- Claiming that its tools are "defensible," while simultaneously thwarting disclosure by asserting that its methodologies are confidential and proprietary, is an attempt to legitimize and fraudulently conceal the illicit nature of the OON conspiracy.

- Repricers, including Zelis, as well as the Insurers, exerting substantial and prolonged efforts to keep the specifics of their relationships, the ways that repricing amount are calculated, and the conspiracy to artificially suppress payments for OON healthcare services out of view of patients and Providers.

- On Zelis' purported claim of the proprietary nature of its claims repricing tools, technologies, and methodologies, Zelis refusing to divulge to a Provider which particular repricing tool, technology, or methodology was

---

[88] *OON Solutions Suite*, Zelis, https://www.zelis.com/solutions/out-of-network-solutions/ (last visited Mar. 19, 2025).

applied with providers. As such, the OON Provider has no way of knowing if Zelis' calculation was accurate or even appropriate.

177. The conspiracy, by its very nature, was and is self-concealing. Before recent investigation, Plaintiff and other Providers considered the OON Insurer market to be competitive. A reasonable person under the circumstances would not have been previously alerted to investigate the legitimacy of Defendants' unlawful conduct.

## VI. Anticompetitive Effects of Defendants' Conduct, Damages, and Antitrust Standing

### A. Defendants' Anticompetitive Effects

178. Defendants' anticompetitive conduct had the following effects, among others:

a. Price competition has been restrained or eliminated with respect to paying Providers for OON healthcare services;

b. Payments for OON healthcare services rendered to patients have been fixed, suppressed, stabilized, or maintained at artificially deflated levels;

c. Plaintiff and members of the Class have been deprived of free and open competition; and

d. Plaintiff and members of the Class have received payments at artificially suppressed price levels for OON healthcare services.

179. The purpose and resulting impact of the Zelis conspiracy is to decrease, fix, stabilize, and/or maintain the price levels for payments to OON providers. As a direct and foreseeable result, Plaintiff and members of the Class have been damaged by receiving payments for OON services at artificially suppressed prices during the Class Period.

B.    **Article III and Antitrust Damages**

1.    **Collusively-Suppressed OON Payment Amounts**

180.    The effects of Defendants' conduct have damaged Plaintiff and Class members through receipt of suppressed payments for OON services during the Class Period.

181.    Defendants' conspiratorial conduct, along with that of competitors and the other co-conspirators, caused Plaintiff and members of the Class direct and proximate harm.

182.    When the Insurer applies Zelis-enabled repricing, there often remains a substantial difference between what the OON Provider is paid and the amount billed. As Scanlan testified, "we [Allied National, Inc., a healthcare insurance company payer] usually pay something less than what that billed amount is." *Butler*, 1:17-cv-17-00050 (D. Mont. Aug. 30, 2018), ECF 94-4 at 2.

183.    A representative from Zelis confirmed Zelis' role in paying OON Providers at amounts less than what was billed. When asked, "[w]hen you say accept the ERS rates, does that mean the ERS rates might be something less than [what] the provider billed?" Zelis' Robert Jackson responded: "Yes." *Butler*, 1:17-cv-00050 (D. Mont. Oct. 5, 2018), ECF 118-11 at 3.

184.    Zelis repeatedly asserts that its repricing tools are highly effective. With respect to the effectiveness, which is to say the retention of the savings or the acceptance by providers, Mr. Jackson testified that "90 percent of the providers who receive claims

priced by ERS accept the ERS rate." *Id*. Zelis admits that its services are effective in downwardly adjusting payment amounts for Providers providing OON services.

185.    By reason of the alleged violations of the antitrust laws described herein, Plaintiff and the Class have sustained injury to their businesses or property, having received lower payments for performing OON services than they would have been paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages.

186.    The pervasive use and application of Zelis' technologies and methodologies have caused widespread and substantial harm to Providers. As included on Zelis' webpage, "Craig, COO of TPA" said: "We're the nation's largest Taft Hartley TPA and have been working with our partner Zelis for the past several years. Our clients have enjoyed average savings of 42%."[89]

---

[89] *Market Based Pricing with Zelis*, Zelis, https://www.zelis.com/solutions/out-of-network-solutions/market-based-pricing/ (last visited Mar. 19, 2025).



187.    Zelis and other co-conspirators have directly and proximately caused Plaintiff and members of the Class harm and damages resulting from the OON conspiracy. By receiving collusively determined and suppressed payments in amounts less than what they would have received for competitively priced OON healthcare services, Plaintiff and members of the Class have suffered Article III harm.

188.    The repricing to Providers performing OON services include an agreement which "outlines Provider's willingness to accept . . . The Repriced Amount . . . ." *Id.* This agreement also includes a prohibition against "balance bill[ing]," which (1) specifies the Provider as the target of conspiratorial repricing, (2) re-confirms the damages experienced by the target of the collusion, and (3) prevents their target from mitigating damages or becoming "whole" again from a damages perspective. Plaintiff and members of the Class have been harmed precisely in the ways Congress intended the federal antitrust laws

remedy. Plaintiff and members of the Class have suffered antitrust damages and possess antitrust standing.

### C.    Antitrust Standing

189.    The harm and damages suffered by Plaintiff and members of the Class constitute an antitrust injury of the type that Congress, through the enactment of the antitrust laws including Section 1 of the Sherman Act, meant to regulate, dissuade, and prevent.

190.    Due to OON underpayments, as communicated at repriced amounts, there is no question that the intended victim of this antitrust conspiracy is Plaintiff and Class members, that such Providers have suffered damages, nor that such Providers have sustained antitrust injury and possess antitrust standing.

## CLASS ACTION ALLEGATIONS

191.    Plaintiff satisfies Federal Rule of Civil Procedure 23 and all other pertinent federal class certification requirements to represent the Class described herein.

192.    Plaintiff invokes Rule 23(a), (b)(2), and (b)(3) on behalf of the following Class:

> All Service Providers who received one or more out-of-network payments that were downwardly adjusted by Zelis or Insurers for out-of-network healthcare services in the United States, including the District of Columbia and U.S. territories, from June 13, 2016, to the present (the "Class Period").

Excluded from the Class are Zelis, any of its subsidiaries; any of its officers, directors and employees; any entity in which Zelis has a controlling interest; and any affiliate, legal representative, heir, or assign of Zelis. Also excluded from the Class are the Insurers, any

of their subsidiaries; any of their officers, directors, and employees; any entity in which an insurer has a controlling interest; and any affiliate, legal representative, heir, or assign of any insurer. Also excluded are any federal, state, or local governmental entity; any judicial officer presiding over this action; the members of the judicial officer's immediate family and staff; and any juror assigned to this action.

193.    Plaintiff provided OON services to patients who maintained insurance, but whose insurance did not include Plaintiff among the policy's, the plan's, or the network's in-network providers. Plaintiff is a member of the Class it seeks to represent.

## I.    Plaintiff Satisfies All Rule 23(a) Requirements.

### A.    The Class Is Sufficiently Numerous

194.    The defined Class is readily identifiable and one for which sufficient and adequate electronic records exist.

195.    Due to the nature of the trade and commerce involved, Plaintiff believes thousands of Class members exist. Defendants know or have records sufficient to determine the exact number of Class members and their identifies.

### B.    Plaintiff's Claims Are Typical of the Members of the Class

196.    Plaintiff's claims are typical of Class members' claims and invoke the same theories of liability, arise from the same course of unlawful conduct, and show that injury of healthcare providers has occurred in the same way, involving the same or similar mechanisms: Defendants paid Providers less for the providers' OON services than Defendants would have absent the existence of the Zelis conspiracy.

### C.    Plaintiff Will Adequately Protect the Interests of the Class

197.    Plaintiff will fairly and adequately protect the interests of the Class members as Plaintiff's interests are aligned with, and not antagonistic to, the interests of Class members.

198.    Plaintiff has retained counsel competent and experienced in prosecuting class actions, litigating antitrust matters, and both in combination.

### D.    This Case Involves Legal and Factual Questions that Share Common Answers with the Class

199.    The resolution of Plaintiff's claim shares many, if not all, of the same legal and factual inquiries and related resolutions as would a similar action brought on behalf of a proposed Class.

## II.    Common Legal and Factual Questions Predominate over Individual Questions and Answers.

200.    Common legal and factual questions and answers predominate over individual or individualized questions, including the following:

- Whether Zelis, the Insurers, and their co-conspirators engaged in an agreement, combination, or conspiracy to suppress, maintain, or stabilize payments made to Providers for their OON services as part of interstate commerce between and among the States, the District of Columbia, and U.S. territories, and in the U.S.;

- The identity of the conspiracy's participants;

- The conspiracy's duration;

- The acts performed by Zelis, the Insurers, and their co-conspirators in furtherance, maintenance, enforcement, preservation, or concealment of the conspiracy;

- Whether the conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

- The effect of the conspiracy on the price of OON services performed in the U.S., the District of Columbia, and U.S. territories during the Class Period;

- Whether Plaintiff and members of the proposed Class suffered antitrust injury as a result of the Zelis conspiracy;

- The appropriate method for measuring damages for injury suffered by Plaintiff and members of the Proposed Class; and

- Whether Plaintiff and members of the Class are entitled to injunctive relief, as well as the form, nature, and extent thereof.

201.    Many, if not all of the above factual and legal questions are commonly shared amongst Plaintiff and members of the proposed Class.

202.    To the extent there might be differences between the experiences of Plaintiff and Class members, such differences relate to considerations regarding the extent, amount, or timing of the injuries at issue and do not defeat class certification.

## III.    A Class Action Is Superior to Other Methods of Dispute Resolution

203.    Here, for the fair and efficient adjudication of this controversy, a class action is superior to other available methods because:

1) individual joinder of all class members is impractical;

2) a class action will eliminate the possibility of duplicative litigation;

3) prosecution of separate actions by individual members of the proposed Class would create the risk of inconsistent or varying decisions and adjudications, creating uncertain and potentially incompatible standards for adjudicating the claims and defenses asserted in this action;

4) the relatively small amount of damages suffered by individual members of the proposed Class, when compared to the expense and burden of individual

prosecution of their individual claims, preclude feasible and practical individual actions to seek redress for the violations alleged; and

5) individual litigation would greatly magnify the delay and expense to all parties and to the court system. For these reasons, a class action will reduce case management difficulties and provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

204.    The conspiracy members have acted on grounds generally applicable to the Class, making final injunctive relief appropriate as applied to the Defendants and as a benefit to the members of the proposed Class as a whole.

### CAUSE OF ACTION

### Count I: Horizontal Conspiracy in Restraint of Trade
### in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

205.    Plaintiff incorporates the above allegations as if set forth herein.

206.    Beginning no later than June 13, 2016, Zelis, the defendant Insurers and other Insurers, and their co-conspirators created and executed a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce.

207.    The contract, combination, or conspiracy alleged herein has consisted of a continuing horizontal agreement between and among Zelis, the defendant Insurers and other Insurers, and all of their co-conspirators to knowingly and collectively use Zelis' repricing tools to collusively fix payment amounts for services performed by OON providers in the U.S. This conspiracy has caused Plaintiff and Class members to receive artificially suppressed payments for performance of OON services during the Class Period.

208.    The contract, combination, or conspiracy alleged herein constitutes a horizontal conspiracy between and among direct competitors participating in the OON insurance market.

209.    In the alternative, the contract, combination, or conspiracy to unreasonably restrain trade and commerce alleged herein has taken the form of a hub-and-spoke conspiracy in which Zelis served and continues to serve as the "hub," the agreements between Zelis and Insurers, and their co-conspirators to use Zelis' repricing tools served and continue to serve as "spokes," and the agreements between the ends of different "spokes" to use Zelis' repricing tools to reprice payments to providers for OON services at artificially suppressed levels served and continue to serve as the "rim."

210.    The unlawful acts and omissions of Zelis, the Insurers, and their co-conspirators in establishing, maintaining, furthering, reinforcing, concealing and/or preserving the conspiracy and its objectives include, but are not limited to, the following:

- Zelis sold and operated its proprietary analytical tools to determine the amounts of payment for OON services performed by OON Providers;

- Zelis' co-conspirators, including other Insurers, facilitated the use of Zelis' analytical pricing tools by submitting their confidential, proprietary, and competitively sensitive claims and pricing data to Zelis, often in real time;

- Zelis' co-conspirators, including Insurers, delegated the processing and pricing of OON claims to Zelis, knowing that Zelis would use their claims and pricing data to set payment prices for OON healthcare claims;

- Zelis and its co-conspirators, including the Insurers, paid claims for OON healthcare services at rates or payment levels as determined by Zelis' pricing tools;

- Zelis, the Insurers, and co-conspirators, including non-defendant Insurers, used many methods of bilateral and multilateral communication about claims, pricing, and payments of claims submitted for OON healthcare services, including their use and endorsement of Zelis' repricing tools, all having the purpose and effect of establishing, maintaining, furthering, reinforcing, concealing and/or preserving their anticompetitive scheme; and

- Zelis, the Insurers, and co-conspirators engaged in efforts to conceal the Zelis conspiracy, the methodologies, calculations, and overrides used in determining OON payment levels, and the identities of its participants.

211.    The acts and omissions by Zelis, the Insurers, and their co-conspirators in establishment, maintenance, furtherance, reinforcement, and concealment of their conspiracy to restrain trade were authorized, ordered, and performed by the Defendants' and their co-conspirators' officers, employees, agents, or representatives while actively engaged in managing their interstate operations.

212.    Zelis, the Insurers, and their co-conspirators possess market power in the relevant antitrust market for payments made to OON Providers by the Insurers composed of private Insurers, PPOs, MCOs, self-funded plans, and self-insured entities.

213.    The relevant geographic market is the U.S., including all fifty states, the District of Columbia, and its territories.

214.    Zelis has caused past and continuing anticompetitive effects in the form of artificially suppressed payments of claims.

215.    As a direct and proximate result of past and continuing violations of Section 1 of the Sherman Act by members of Zelis conspiracy, Plaintiff and members of the Class have been injured in their business or property and will continue to be injured in their

respective businesses and properties by receiving lower payments for OON claims than they would have received, absent the conspiracy.

216.    The Zelis conspiracy is a *per se* violation of Section 1 of the Sherman Act.

217.    In the event that a presiding Court determines that the violations are not *per se*-based, there are no procompetitive justifications or excuses for the Zelis conspiracy and any such justifications could have been achieved through less restrictive means.

218.    In the alternative, the Zelis conspiracy violates Section 1 of the Sherman Act under either a "quick look" or a full "rule of reason" analysis. The combination and conspiracy alleged had these effects, among others:

- Price competition in the payment for OON healthcare services has been restrained, suppressed, and eliminated as to interstate commerce in the U.S.;

- Plaintiff and members of the Class who directly received payments for their respective OON healthcare services from Zelis, the Insurers, or their co-conspirators, including their respective divisions, subsidiaries, and affiliates, were deprived of the benefits of free and open competition with respect to the prices paid for those OON services.

219.    Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by suppressing and fixing payments for claims submitted for OON services throughout the U.S. as Defendants provide repricing and payment-related services throughout the U.S., the District of Columbia, and U.S territories.

220.    The conspiratorial acts and combinations have caused unreasonable restraints in the OON insurance market.

221.    Plaintiff and members of the Class have been injured and will continue to be injured in their respective businesses and properties by receiving smaller payments for their

performance of OON services from Zelis, the Insurers, and their co-conspirators than they would have been paid absent the conspiracy.

222.    The contract, combination, coordination, understanding, agreement, collusive conduct, or conspiracy is a *per se* violation of the federal antitrust laws.

223.    Plaintiff and members of the Class are entitled to an injunction against all members of the Zelis conspiracy, including Zelis, the Insurers, and their co-conspirators, to prevent and restrain their unlawful conduct.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief:

A.    Certify this action as a class action under Rule 23(a), (b)(2), and (b)(3); appoint Plaintiff as Class representative and its counsel as Class Counsel; and direct that notice of this class action as provided by Rule 23(c)(2) be given to members of the Class;

B.    Declare that the conspiracy alleged herein violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    Enter judgment for Plaintiff and the Class against Defendants for all available damages, including pre- and post-judgment interest and treble damages, sustained in the form of claim underpayments, lost revenue and profits, and all other economic harm resulting from Zelis' and the Insurers' violations of the Sherman Act;

D.    Injunctive relief enjoining Defendants, the Insurers, and their co-conspirators, and those acting in concert with them, from continuing, maintaining, furthering, reinforcing, concealing, preserving, and/or renewing the conduct, conspiracy, or combination and from entering into any other contract, conspiracy, or combination

having a similar purpose or effect, and from adopting or following any practice, plan, program, or device from having a similar purpose or effect, and/or from adopting or following any practice, plan, program, or device having a similar purpose or effect caused by any further violation of antitrust law;

    E.    Award Plaintiff's and Class members' costs and expenses of prosecuting this action, including all reasonable attorneys' fees as permitted by law; and

    F.    Such other and further relief as the Court may deem equitable and just.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury, pursuant to Rule 38(b), of all issues so triable.

Dated: June 3, 2025        Respectfully Submitted,

*/s/ Maureen E. Forsyth*
Maureen E. Forsyth (MA #642390)
Jason S. Hartley (*pro hac vice*)
**HARTLEY LLP**
#101 West Broadway, Suite 820
San Diego, CA 92101
Telephone: (619) 400-5822
*forsyth@hartleyllp.com*
*hartley@hartleyllp.com*

Garrett D. Blanchfield
Brant D. Penney
Roberta A. Yard
**REINHARDT WENDORF &
BLANCHFIELD**
80 South 8th Street, Suite 900
Minneapolis, MN 55402
Tel: (651) 287-2100
*g.blanchfield@rwblawfirm.com*
*b.penney@rwblawfirm.com*
*r.yard@rwblawfirm.com*

*Attorneys for Plaintiffs*